**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

EL DORADO SPRINGS 6035, LLC,

Plaintiff

v.

WESTERN SURETY COMPANY,

Defendant

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, El Dorado Springs 6035, LLC ("El Dorado"), by and through its attorneys, McConaughy & Sarkissian, Professional Corporation, hereby submits the following Complaint and Jury Demand and, in support thereof, states as follows:

**PARTIES**

1. El Dorado is a Colorado limited liability company, doing business in El Paso County, Colorado.

2. Part of El Dorado's business includes the ownership of real property and associated improvements in El Paso County.

3. Defendant Western Surety Company ("Western") is a South Dakota corporation authorized to do, and doing, business in the state of Colorado.

**JURISDICTION AND VENUE**

4. The amount in controversy in this case exceeds $75,000.00, exclusive of

interest, costs, and attorney fees.

5. This controversy is between corporate entities which are citizens of different states.

6. The Court has jurisdiction of this case pursuant to 28 U.S.C. §1332.

7. Pursuant to 28 U.S.C. §1391, venue is appropriate in the District of Colorado because the events herein complained of occurred in Colorado, and because the property involved is located in Colorado.

8. Western is subject to jurisdiction in the District of Colorado because it has sufficient contacts in the state of Colorado so as not to offend traditional notions of justice or due process, including issuance of payment and performance bonds securing a contractor's obligations upon a construction project located in Colorado.

## FACTUAL ALLEGATIONS

### A. <u>Background</u>

9. El Dorado owns real property in El Paso County, Colorado, with the present address of 1810 Eldorado Springs Heights, Colorado Springs, Colorado, 80906 (the "Property").

10. El Dorado intended to develop the Property into a multi-building apartment complex to be named El Dorado Springs Apartments (the "Project").

11. The Project is a premium, upscale, HUD-insured, multi-family residential development comprising hundreds of residential units within numerous buildings, along with attached garages, detached garages, carports, uncovered parking areas, a clubhouse, a pool, a spa, recreational areas, a playground, and a dog park.

12. El Dorado financed the Project via Orix Real Estate Capital, LLC, now known as Lument Real Estate Capital, LLC (the "Lender").

13. To facilitate financing from Lender, Emery S. Chukly ("Chukly"), individually, entered into an Extension Fee and Remarketing Agreement with Lender on July 23, 2021 (the "Extension Fee Agreement").

14. The Extension Fee Agreement requires Chukly to pay Lender $67,175.13 for each month after March 23, 2024, in the event that Final Endorsement of the Project has not been obtained from HUD.

15. In the event Final Endorsement was not achieved by March 23, 2025, the Extension Fee Agreement allowed Lender to reset the interest rate for the loan and charge all related costs to Chukly.

16. On July 23, 2021, El Dorado entered into a construction contract (the "Construction Contract") with EMJ Corporation d/b/a EMJ Construction LLC ("EMJ") for the construction of the Project.

17. The Construction Contract incorporated the Contract Documents including, but not limited to, General Conditions, which are included in the term "Construction Contract" in this Complaint.

18. Among the incorporated documents were regulations and handbooks promulgated by the Department of Housing and Urban Development ("HUD").

19. The Project and Construction Contract were performed under HUD project number 101-35801.

20. HUD is the insurer of the Lender's loan.

21. HUD otherwise retained various interests in the Project, including the right and responsibility for various approvals, including Final Endorsement.

22. The Construction Contract governed EMJ's performance of its duties.

23. Among other requirements, the Construction Contract required EMJ to:

a. Perform its work in accordance with the Contract Documents;

b. Employ adequate personnel for supervision and oversight of the Project;

c. Enforce strict discipline and good order among the personnel performing work;

d. Not permit employment of unfit persons or persons not properly skilled in tasks assigned to them;

e. Warranty materials used in the Project and warranty that EMJ's work would conform to the Contract Documents and the Construction Contract;

f. Submit an appropriately-detailed schedule and regular revisions to the same, and perform its work in accordance with the same;

g. Proceed with the Project expeditiously;

h. Provide reasonable protection to and/or storage for materials to be incorporated into the Project;

i. Promptly correct work rejected by the Project's architect or otherwise not in compliance with the Contract Documents if discovered before substantial completion;

j. In addition to the warranties referenced above, promptly correct work that is not in accordance with the Contract Documents if reported by El Dorado

within a year of substantial completion;

k. Indemnify and hold harmless El Dorado against claims, damages, losses, or expenses arising out of EMJ's performance of its contractual duties;

l. Defend and indemnify El Dorado against loss, liability, damage or expense, including reasonably attorney's fees and litigation expenses, arising out of any lien claims or other claims for payment by any subcontractors or suppliers; and

m. Certify its actual costs of construction in a form acceptable to HUD.

24. In addition to the Construction Contract, El Dorado and EMJ entered into an Agreement between Owner & Contractor dated July 23, 2021 (the "Side Agreement").

25. The Side Agreement included a HUD-approved phasing plan for the sequential construction and staggered delivery of the Project's buildings in order to maximize the financial potential of the Project.

26. The Side Agreement remained subject to various HUD requirements.

27. EMJ obtained a payment bond on July 23, 2021, issued by Western as Bond No. 30130007 (the "Payment Bond").

28. EMJ obtained a performance bond on July 23, 2021, issued by Western as Bond No. 30130007 (the "Performance Bond").

29. The Payment Bond and the Performance Bond may be referred to jointly herein as the "Bonds."

30. The Bonds jointly obligate EMJ and Western as "Obligors."

31. Under the Payment Bond, Western as an Obligor bound itself "to pay for labor,

materials, and equipment furnished for use in the performance of the Contract."

32. Under the Performance Bond, Western as Obligor bound itself "for the performance of the Contract."

33. All conditions precedent to the Bonds becoming effective have been satisfied.

B. EMJ's Performance on the Project

34. EMJ has not satisfactorily performed or completed its obligations on the Project.

35. EMJ's failures include, but are not limited to, the following:

a. EMJ did not construct the Project in accordance with the Construction Contract and/or the Contract Documents and/or the Side Agreement;
b. EMJ did not employ adequate personnel for supervision and oversight;
c. EMJ has not enforced strict discipline and good order at the Project;
d. EMJ has permitted the employment of unfit persons or persons not properly skilled in their assigned tasks;
e. EMJ has not warrantied the materials or the workmanship at the Project, despite faults in both;
f. EMJ did not provide adequately-detailed schedules to El Dorado, including appropriate critical path-based schedules, has not updated its schedules at appropriate intervals, and has not followed the limited schedules that it did submit;
g. EMJ did not proceed expeditiously with the Project;
h. EMJ failed to properly handle and/or store materials;

i. EMJ has not corrected its work when notified of deficiencies;

j. EMJ has not indemnified and held harmless El Dorado against claims, damages, losses, and expenses arising out of EMJ's failed performance of its contractual duties;

k. EMJ has not defended and indemnified El Dorado from losses, liabilities, damages or expenses, including reasonable attorney's fees and litigation expenses, arising from lien claims or other claims for payment by any subcontractor or supplier; and/or

l. EMJ has failed to provide and certify its actual costs of construction as required by HUD.

36. During the Project, EMJ submitted numerous change orders intended to extend its schedule and increase the project timeline.

37. These change orders lacked adequate information, even when resubmitted.

38. The project architect rejected each of these change orders in writing, while approving other legitimate change orders submitted in the same time frame.

39. EMJ has not timely paid subcontractors and materiel suppliers, despite receipt of funds from El Dorado.

40. This failure to pay has resulted in delays to subcontractors' work, multiple liens being recorded against the Property, clouds upon El Dorado's legal title, multiple lawsuits consequently filed against El Dorado, and a need to post bonds to release mechanics' liens recorded by the unpaid parties.

41. El Dorado notified EMJ of these and other issues while construction remained

ongoing.

42. Such notifications included a meeting between El Dorado and EMJ representatives at the Project site on November 15, 2023, at which El Dorado directed EMJ's attention to defects in construction, lack of site supervision, out-of-sequence construction and other scheduling issues, and the lack of cleanliness on site leading to damaged materials.

43. In December 2023, El Dorado retained an on-site consultant to act as an owner's representative to protect El Dorado's interests.

44. This consultant consistently identified numerous deficiencies in EMJ's work to date, including defective work and deficient management.

45. On December 21, 2023, EMJ unilaterally informed El Dorado that it would not comply with the phased delivery of individual buildings at the Project, which was in violation of the Side Agreement.

46. Instead, EMJ stated that it would deliver all buildings in a single phase at the end of construction, which was in violation of the Side Agreement.

47. EMJ claimed to have achieved substantial completion in November 2024.

48. HUD's 100% Inspection Report was completed on or about November 22, 2024.

49. The Construction Contract originally required EMJ to achieve substantial completion by May 23, 2023.

50. Approved change orders between EMJ and El Dorado extended the substantial completion date until September 28, 2023.

51. Notwithstanding EMJ's delay in obtaining substantial completion, El Dorado informed EMJ on January 9, 2025 that El Dorado had completed its cost certification for the Project and it had been sent to the Lender for review, and also identified items that EMJ would need to submit to the Lender in support pursuant to the Construction Agreement.

52. Despite repeated requests in January and February of 2025, EMJ failed to provide its certification of costs for the Lender's review.

53. Following EMJ's failure to provide its cost certification, Lender sent an e-mail to EMJ stating that EMJ was "out of compliance with HUD's required timing to provide a completed cost certification . . . ." and that "immediate attention is needed."

54. Despite Lender's correspondence, EMJ has still not provided a cost certification.

55. EMJ's cost certification was necessary for, *inter alia*, HUD's granting of Final Endorsement.

56. Final Endorsement of the Project was not achieved by March 23, 2024 or by March 23, 2025.

57. Final Endorsement was not achieved until September 9, 2025.

58. Upon El Dorado's information and belief, Final Endorsement is the official post-construction closing milestone at which:

a. HUD has completed its audit of a project's cost certifications;

b. HUD has confirmed that the project has been completed; and

c. HUD formally endorses a mortgage note for permanent insurance.

59. Upon El Dorado's information and belief, for apartment construction, Final

Endorsement signifies the transition from construction financing to a long-term, fixed-rate permanent loan.

60. Upon El Dorado's information and belief, achieving Final Endorsement crystalizes the final loan balance and allows for the release of remaining escrowed funds, contractor retainages, and developer fees.

61. Because of EMJ's failure to provide its cost certification in accordance with the Construction Contract, El Dorado and its personnel were required to expend substantial efforts and resources, over an extended and unanticipated period of time, to provide a cost certification for and on behalf of EMJ in such form that HUD was willing to accept.

62. In sum:

a. EMJ has materially breached the Construction Contract and the Side Agreement;

b. EMJ has failed to pay its subcontractors and suppliers;

c. To date, EMJ has failed and/or refused to remedy its breaches and failures; and

d. As a result of EMJ's failures, El Dorado has been exposed to, and incurred, additional expenses, costs, and damages.

C. Western's Involvement

63. El Dorado has made multiple demands upon Western to make payment to subcontractors and suppliers that have not been paid by EMJ.

64. El Dorado has made multiple demands upon Western to step in and assist, to complete EMJ's Work and/or correct EMJ's deficient Work.

65. Throughout the Project, El Dorado has on numerous occasions made Western aware of EMJ's breaches of the Construction Contract and Side Agreement, EMJ's deficient work, and EMJ's failure to pay subcontractors and suppliers.

66. Western's response to El Dorado's requests have been routinely insufficient and obstructive, by:

a. Requesting the same documents repeatedly;

b. Failing to clear the liens on the Property; and

c. Failing to undertake any reasonable or adequate investigation.

67. Western has not paid "for labor, materials, and equipment furnished for use in the performance of the Contract."

68. Western has not undertaken or otherwise seen to "performance of the Contract."

69. Western has never provided or articulated a comprehensive denial, a coherent position regarding El Dorado's bond claims, or Western's position on the same.

70. Western has otherwise failed to meet its obligations under the Bonds.

71. As a result of Western's failure to meet its obligations, El Dorado has been forced to remedy EMJ's shortcomings on its own time and at its own expense, which has included, but is not limited to:

a. Cost and time expenditures to repair or replace defective work;

b. Cost and time expenditures to complete incomplete work;

c. Cost and time expenditures associated with EMJ's nonpayment of subcontractors;

d. Cost and time expenditures associated with EMJ's failure to complete the Project;

e. Cost and time expenditures to provide bonds and/or securities to cover or release liens recorded against the Property by subcontractors and/or suppliers; and

f. Cost and time expenditures associated with EMJ's failure to provide HUD with the requisite certification of costs necessary for Final Endorsement.

**CLAIMS FOR RELIEF**

**COUNT 1**
**Breach of Contract (Payment Bond)**

72. El Dorado incorporates the allegations above as if fully set forth herein.

73. The Payment Bond is a contract between, *inter alia*, El Dorado and Western, and is otherwise intended for the benefit of El Dorado.

74. The Payment Bond requires Western, as Obligor, to "pay for labor, materials and equipment furnished for use in the performance of the Contract."

75. El Dorado has performed all conditions and obligations under the Construction Contract, Side Agreement, and the Payment Bond.

76. EMJ has failed to pay all amounts due to subcontractors and suppliers owed under the Construction Contract.

77. El Dorado is entitled to receive payment from Western pursuant to the Payment Bond for the amounts owed by all Claimants, as defined in the Payment Bond.

78. Western is obligated to make payments to El Dorado under the Payment Bond.

79. Western has failed to make payments under the Payment Bond, despite requests to do so.

80. El Dorado has been damaged by EMJ's failures to timely pay subcontractors and suppliers, despite requests to do so.

81. El Dorado has been damaged by Western's failure to make payments under the Payment Bond.

**COUNT 2**
**Breach of Contract (Performance Bond)**

82. El Dorado incorporates the allegations above as if fully set forth herein.

83. The Performance Bond is a contract between, *inter alia*, El Dorado and Western, and is otherwise intended for the benefit of El Dorado.

84. Under the Performance Bond, Western, as Obligor, bound itself "for the performance of the Contract."

85. El Dorado has performed all conditions and obligations under the Construction Contract, Side Agreement, and the Performance Bond.

86. EMJ has failed to perform under the Construction Contract and the Side Agreement.

87. EMJ has failed to indemnify and save harmless El Dorado from costs and damages arising from EMJ's failures to perform.

88. As Obligor, Western is bound to ensure the performance of the Construction Contract.

89. As Obligor, Western is bound to otherwise ensure EMJ's performance of its obligations to properly and timely complete the Project.

90. El Dorado has been damaged by EMJ's failures to perform.

91. Western has failed to ensure EMJ's performance.

92. El Dorado has been damaged by Western's failure to ensure EMJ's performance.

## <u>COUNT 3</u>
## Breach of the Duty of Good Faith and Fair Dealing

93. El Dorado incorporates the allegations above as fully set forth herein.

94. The Bonds are subject to Colorado law and, as such, are subject to the duty of good faith and fair dealing.

95. At all times relevant to this matter, Western had substantial discretion in the performance of its duties as a surety, including a determination of what, if any, investigation it would undertake, and whether to provide benefits under the bonds.

96. As part of its discretionary performance, Western was required to observe reasonable standards of fair dealing in the performance of its responsibilities.

97. Western retained complete and unfettered discretion in the performance and extent of its own investigation into conditions at the Project.

98. Western had complete and unfettered discretion as to its own determination of whether to provide El Dorado, or any third parties entitled to assert claims, with benefits or payments.

99. El Dorado reasonably expected Western to perform a proper investigation.

100. El Dorado reasonably expected Western to provide benefits.

101. Upon information and belief, Western has unreasonably failed to perform an adequate investigation as to conditions at the Project.

102. Western has unreasonably failed to meet its obligations to provide benefits under the Bonds.

103. Such failures constituted breaches of the duty of good faith and fair dealing.

104. As the result of Western's conduct, El Dorado has suffered damages.

**COUNT 4**
**Breach of Quasi-Fiduciary Duty**

105. El Dorado incorporates the allegations above as if fully set forth herein.

106. Under Colorado law, as a surety, Western owes its Obligees, including El Dorado, a quasi-fiduciary duty as to all aspects of the suretyship.

107. This quasi-fiduciary duty required Western to, at all times, act reasonably under the attendant circumstances.

108. This quasi-fiduciary duty required Western to act reasonably in investigating, determining, and considering the attendant circumstances.

109. Western has failed to act reasonably under the circumstances by:

a. Failing to conduct an investigation that was adequate to inform Western of the conditions at the Project;

b. Failing to consider the conditions present at the Project in determining the availability of benefits under the Bonds;

c. Failing to provide benefits to El Dorado and/or third-party Claimants under the Bonds; and/or

d. Failing to provide a sufficient explanation as to Western's determination not to provide benefits under the Bonds.

110. As a result of Western's conduct, El Dorado has suffered damages.

**COUNT 5**
**Common Law Bad Faith**

111. El Dorado incorporates the allegations above as if fully set forth herein.

112. Under Colorado law, as a surety, Western has an obligation to act reasonably in regard to its Obligees, including El Dorado.

113. Western has acted unreasonably in:

a. Failing to conduct an investigation that was adequate to inform Western of the conditions at the Project;

b. Failing to consider the conditions present at the Project in determining the availability of benefits under the Bonds;

c. Failing to provide benefits to El Dorado under the Bonds; and/or

d. Failing to provide a sufficient explanation as to Western's determination not to provide benefits under the Bonds.

114. Upon information and belief, Western knew that the actions or failures listed in ¶109 were unreasonable.

115. In the alternative, upon information and belief, Western recklessly disregarded the fact that the actions or failures listed in ¶109 were unreasonable.

116. As the result of Western's conduct, El Dorado has suffered damages.

**COUNT 6**
**Violation of C.R.S. §10-3-1115/1116**

117. El Dorado incorporates the allegations above as if fully set forth herein.

118. The Bonds are express contracts between El Dorado and Western, creating a suretyship for the benefit of El Dorado as an Obligee.

119. The Bonds, as contracts of suretyship, are insurance policies or insurance contracts pursuant to C.R.S. §10-3-1102(2).

120. As a surety, Western is an "insurer" pursuant to C.R.S. §10-1-102(13).

121. Western was required to provide benefits to El Dorado pursuant to the Bonds.

122. Western delayed and/or denied authorizing any payment of a covered benefit without a reasonable basis for its actions.

123. Western's failures to pay covered benefits to El Dorado are without basis in either fact or in law.

124. As a result of Western's conduct, El Dorado has suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff El Dorado Springs 6035, LLC respectfully requests that judgment enter in its favor and against Defendant Western Insurance Company, and asks for the following relief:

A. On its First Claim for Relief, for damages in an amount to be proven at trial;

B. On its Second Claim for Relief, for damages in an amount to be proven at trial;

C. On its Third Claim for Relief, for damages in an amount to be proven at trial;

D. On its Fourth Claim for Relief, for damages in an amount to be proven at trial;

E. On its Fifth Claim for Relief, for damages in an amount to be proven at trial;

F. On its Sixth Claim for Relief, for damages in an amount to be proven at trial including, but not limited to, reasonable attorney fees, court costs, plus two times the covered benefit pursuant to C.R.S. §10-3-1116(1), in addition to damages recoverable under any other actions available via statute, contract, rule, or common law;

G. As to all claims for relief, for court costs, expert witness fees, attorney fees, and pre- and post-judgment interest, as provided by law or agreement; and

H. As to all claims for relief, for such other and further relief, including equitable relief, as this Court deems just and appropriate under the circumstances.

**EL DORADO DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Dated this 28th day of August, 2026.

Respectfully submitted,

**ATTORNEYS FOR PLAINTIFF**

**McCONAUGHY & SARKISSIAN, P.C.**

By: *<u>/s/ David C. Taylor</u>*

Ivan A. Sarkissian, #28817
Nathaniel Rioux Jordan, #52715
David C. Taylor, #38646
4725 S. Monaco Street, Suite 200
Denver, CO 80237
Tel: (303) 649-0999
Fax: (303) 649-0990
isarkissian@mslawpc.com
njordan@mslawpc.com
dtaylor@mslawpc.com